612 F.2d 343
 102 L.R.R.M. (BNA) 3074, 87 Lab.Cas. P 11,722
 David L. HAMILTON, Appellant,
v.
CONSOLIDATED FREIGHTWAYS and International Brotherhood of
Teamsters, Chauffeurs, Warehousemen and Helpers of
America, Local No. 41, Appellees.
 No. 79-1042.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 6, 1979.
Decided Dec. 12, 1979.
 
 David L. Hamilton, pro se.
 John P. Hurley, Jolley, Moran, Walsh, Hager & Gordon, Kansas City, Mo., for International Brotherhood of Teamsters, etc.
 Raymond F. Beagle, Jr., Richard B. McKelvey, and George P. Coughlin, Gage & Tucker, Kansas City, Mo., for Consolidated Freightways.
 Before HEANEY, STEPHENSON and McMILLIAN, Circuit Judges.
 PER CURIAM.
 
 
 1
 David L. Hamilton is a former employee of Consolidated Freightways and a former member of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 41. He filed a complaint to recover wages and damages under 29 U.S.C. § 185, alleging that he had been wrongfully terminated by Consolidated and that the Union breached its duty to fairly represent him in the handling and processing of his discharge grievance. After a three-day trial, the jury reached a verdict in favor of Consolidated. Hamilton appeals, proceeding Pro se.
 
 
 2
 In 1975, Hamilton worked for Consolidated as an "extra-board" over-the-road driver and was a member of the Union. Consolidated and the Union were signatories to the National Master Freight Agreement and the Central States Area Over-The-Road Supplemental Agreement. These documents constituted the collective bargaining agreement between the parties for the period of July 1, 1973, through March 31, 1976. During his employment with Consolidated, the terms and conditions of Hamilton's employment were governed by the foregoing collective bargaining agreement and also the "Agreed Upon Methods of Operations and Dispatch Procedures Affecting Kansas City, Missouri Consolidated Freightways Over-The-Road Drivers and Local Union No. 41." The Methods of Operations agreement required all covered drivers, including Hamilton, to obtain permission from their respective supervisors before taking time off for personal reasons.
 
 
 3
 Hamilton was discharged for failing to obtain the necessary advance permission and therefore being unavailable for work when called for a dispatch. On Friday morning, November 28, 1975, Hamilton called the dispatch office, inquiring as to his status on the board and stating that he needed to get his automobile license that morning. The Consolidated dispatcher advised Hamilton that he was listed as number twelve on the board but that quite a few of those listed ahead of him had "short hours" and were therefore not available for long runs. Later that same morning, a dispatcher contacted Hamilton to assign him a dispatch for 12:30 p. m. that day but Hamilton asked to go off the board on "personal business will call" status. Hamilton's telephone line was put on hold while the dispatcher called Dobyns, the dispatcher operations manager. Dobyns refused to give approval for Hamilton to go off the board. When the dispatcher returned to the line to inform Hamilton of Dobyns' decision, he found the line disconnected. The dispatcher immediately attempted to call Hamilton at his home, but there was no answer. About four hours later, Hamilton called the dispatch office to request that he be put back on the board as an available driver. The Consolidated dispatcher contacted Hamilton by telephone approximately one hour later, notifying him that Consolidated was placing him on suspension pending investigation.
 
 
 4
 Shortly after Hamilton was told that he had been placed on suspension, he contacted Jack Thomas, the local business agent for the Union. Thomas contacted Dobyns by telephone and discussed with him the circumstances and events leading up to the suspension. On the afternoon of December 1, 1975, Dobyns telephoned Hamilton and advised him that Consolidated had investigated the events of November 28, 1975, and that Hamilton's employment with Consolidated was being terminated for being unavailable for work. Dobyns also said that he wanted to inform Hamilton of the discharge as soon as possible in order to give him an opportunity to contact the Union and have his discharge heard before the Joint State Grievance Committee. On the same day, Consolidated mailed to Hamilton his discharge letter.
 
 
 5
 Coincidentally, the regular monthly hearings of the Joint State Grievance Committee had been scheduled for December 2 and 3, 1975. Thomas inserted Hamilton's discharge as an "added case" on the regularly scheduled hearing agenda and so informed Hamilton. Thomas further arranged for Hamilton to come with him to the hearing.
 
 
 6
 The hearing before the Committee was conducted during the afternoon of December 2, 1975. Present before the Committee were Hamilton, Thomas, Dobyns and Sciortino, Dobyns' supervisor. Thomas made a brief presentation of the facts and Hamilton was given an opportunity to make an extended statement before the Committee. After the hearing was concluded, the Committee adjourned in closed session to deliberate. The Committee unanimously decided to uphold Hamilton's discharge. Hamilton then filed this action.
 
 
 7
 Hamilton raises the following issues on appeal:[1]
 
 
 8
 (1) whether the evidence was sufficient to support the jury verdict;
 
 
 9
 (2) whether the district court erred in excluding certain evidence; and
 
 
 10
 (3) whether the trial court was biased so as to deny him a fair trial.
 
 I.
 
 11
 Clearly the central issue is whether there was sufficient evidence to support the jury verdict. A special verdict form which included eight separate questions was submitted to the jury. Question No. 1 read:
 
 
 12
 Do you find from a preponderance of the evidence that the acts of Local Union No. 41, in the processing and the handling of David L. Hamilton's discharge grievance, were arbitrary or discriminatory or dishonest or in bad faith?
 
 
 13
 Answer "Yes" or "No".
 
 
 14
 If your answer is "No", stop and go no further. If your answer is "Yes", go to question No. 2.
 
 
 15
 The wording of the special verdict form is based upon the legal principle that where the collective bargaining agreement provides for binding arbitration, as is the case here, the decision of the arbitrator is ordinarily final unless the exclusive bargaining agent has breached its duty of fair representation.[2] Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 571, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); Humphrey v. Moore, 375 U.S. 335, 351, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964).
 
 
 16
 The jury answered Question No. 1 in the negative. The issue on appeal, therefore, is whether there is sufficient evidence to support the jury's verdict that the Union did not breach its duty of fair representation.
 
 The Union's duty of fair representation
 
 17
 includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.
 
 
 18
 Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967).
 
 
 19
 We have carefully reviewed the voluminous record, including the transcript of trial, and are convinced that there was substantial evidence to support the jury verdict that the Union's representation was in compliance with the standard set forth in Vaca v. Sipes. Thomas, the Union agent, investigated the discharge and promptly placed it on the hearing calendar. In preparation for the grievance hearing on Hamilton's discharge, Thomas visited Consolidated's facility and questioned Consolidated officials regarding the circumstances surrounding Hamilton's suspension and termination. At that time, he listened to a tape recording of the various telephone conversations between Hamilton and Consolidated personnel. Thomas was also given a copy of a warning letter issued to Hamilton in March of 1975. If that warning letter was not valid, neither would be Hamilton's discharge.[3]
 
 
 20
 Prior to the hearing on December 2, 1975, Thomas met with Hamilton to review the case. At that time, Thomas was aware of the facts surrounding the incident that led to Hamilton's discharge. Their discussion centered on Hamilton's contention that the March 14, 1975, warning letter was not valid. Thomas explained that the Union could attempt to attack the validity of the prior warning letter in the hearing if there were any grounds for doing so and that Hamilton was free to fully explain his version of the facts on both the discharge issue and the warning letter to the Committee. Thomas was present at the grievance proceeding while Hamilton offered extensive testimony in support of the grievance.
 
 
 21
 Hamilton's claim of unfair representation appears to involve two distinct arguments: (1) that Thomas did not present all favorable evidence on his behalf; and (2) that the Union's custom of delaying the processing of a grievance on a warning letter until that warning letter is used as a basis for suspension or discharge is improper.
 
 
 22
 1. Failure to present favorable evidence.
 
 
 23
 Hamilton argues that Thomas should not have scheduled the hearing so quickly but instead should have given him additional time to prepare. However, he has made no showing that he was prejudiced by the prompt hearing. The evidence that Hamilton contends would have been presented to the Hearing Committee had he been given a reasonable time to prepare would have had no effect on the Hearing Committee's decision.
 
 
 24
 (a) Hamilton's illness excuse.
 
 
 25
 The evidence at trial did reflect that in a telephone call to Thomas on January 27, 1976, Hamilton told Thomas that the March 14 warning letter was invalid because his failure to be available for work was due to fatigue.[4] When Thomas replied that the committee did not believe his fatigue excuse, Hamilton announced that he had been to the doctor on the day he had been found unavailable for work, and had a doctor's statement to that effect. On the basis of this evidence, he sought to have the hearing reopened. Thomas then told Hamilton that he would listen to the tape of the grievance proceeding and reread the warning letter.
 
 
 26
 On February 2, 1976, Hamilton and Thomas spoke again by telephone. Thomas told Hamilton that he had listened to the tape and that the warning letter had been for being unavailable for work. He rejected the request that he petition to reopen the hearing because the doctor's statement showed illness, not fatigue, and Hamilton never claimed that illness was the reason for his inability to work on March 12, 1979.
 
 
 27
 The jury properly found that there was no breach of the duty of fair representation when Thomas refused to petition to have the hearing reopened. As Thomas stated, since Hamilton did not claim that he was ill on March 12 when he talked with the dispatcher, his subsequent ability to prove illness on that day would not affect the validity of the March 14 warning letter. Furthermore, we note that the doctor's statement would not be helpful to Hamilton in any event because it shows that Hamilton visited the doctor on March 11, 1975, the day Before the incident that gave rise to the March 14 warning letter.
 
 
 28
 (b) Company's failure to comply with dispatch procedures.
 
 
 29
 Hamilton also contends that the Union agent could have presented evidence that Hamilton was dispatched on November 28 ahead of twenty-three other drivers who should have been dispatched first. Even assuming that Hamilton was dispatched ahead of schedule, we do not understand the relevance of that fact to the validity of Hamilton's discharge. Hamilton refused a dispatch and failed to follow established procedures for obtaining permission to take time off for personal business. Whether Consolidated should have dispatched other drivers before him is inconsequential.
 
 
 30
 (c) Company and Union bias against Hamilton.
 
 
 31
 Finally, Hamilton maintains that other drivers had much worse records of being unavailable for work and yet were not discharged. He argues that the Company and the Union were prejudiced against him because he was actively involved in the "Professional Drivers Council" (PROD), an organization described in the record as a group of truck drivers promoting highway safety, and that his discharge and poor union representation were in retaliation for his participation in PROD.
 
 
 32
 Thomas, Dobyns and Sciortino all testified that they were unaware of Hamilton's membership in PROD. Hamilton presented no evidence at trial to establish that either the Company or the Union personnel involved in the discharge and subsequent grievance proceedings had any specific knowledge of his PROD activities prior to his discharge. Furthermore, the Company and Union personnel testified that they did not single Hamilton out for retaliatory action. There was, in short, ample evidence to support the jury's finding that the Union did not breach its duty of fair representation in failing to present this claim to the Committee.
 
 
 33
 2. Union's delay in processing grievance on March 14 warning letter.
 
 
 34
 Pursuant to a long-established custom within the Missouri-Kansas area, local unions defer processing of all grievances filed as a result of disciplinary warning letters, until and unless the grievant is subsequently discharged or suspended and such warning notice is related to the discharge or suspension. The custom developed as a means to avoid further clogging of the already overcrowded grievance machinery. A grievance was filed over the March 14, 1975, warning letter but, pursuant to custom, was not processed immediately. Hamilton argues that this delay in the processing of his grievance constituted a breach of the duty of fair representation.
 
 
 35
 We find no evidence in the record showing that the custom of delaying the processing of the grievance on the March 14 warning letter prejudiced the Hearing Committee's decision. The jury properly found no breach of duty on this basis.
 
 II.
 
 36
 Hamilton also claims error in the district court's refusal to admit into evidence certain documents relating to his claims that the Company dispatched him ahead of twenty-three other drivers who should have been dispatched first, and that the Company did not discharge other employees with worse refusal-to-work records. As indicated earlier, however, these claims are devoid of merit. In any event, Hamilton testified as to the substance of these documents. The district court, therefore, committed no error in refusing to admit them.
 
 
 37
 Hamilton also complains of the district court's refusal to allow into evidence a transcript of his February 2, 1976, telephone conversation with Thomas. Hamilton and Thomas testified as to the substance of that conversation, and their accounts did not conflict. Therefore, the district court's refusal to admit the transcript, if error, was harmless.
 
 III.
 
 38
 Hamilton makes numerous unsubstantiated allegations that the district judge conspired with the defendants to deprive him of his livelihood. We will not dignify those allegations with further description. Our review of the record has convinced us that the district court was totally unbiased and accorded the plaintiff every possible measure of assistance.
 
 
 39
 Judgment affirmed.
 
 
 
 [1]
 Hamilton also alleges that his court-appointed counsel was ineffective. This issue is not properly before us. We note that Hamilton has filed a malpractice action in the district court. David L. Hamilton v. Griffin Bell, et al., W.D.Mo., Civil Action No. 78-0976-CV-W-4
 
 
 [2]
 There is no allegation here that the parties or the grievance committee exceeded powers under the collective bargaining agreement
 
 
 [3]
 The collective bargaining agreement between Consolidated and the Union provided, among other things, that Consolidated give to an employee at least one warning notice for particular misconduct prior to discharging or suspending that employee for the same or similar and subsequently committed misconduct. Such warning letters remain in effect for nine months from the date of issuance and, if no discharge or suspension involving the same offense is issued during the nine-month effective period of the warning notice, such notice becomes inoperative
 On March 9, 1975, Hamilton requested of a Consolidated dispatcher that he be "taken off the board" as an available driver and put on "sick will call." During the morning of March 12, 1975, Hamilton requested that he be put back on the board as an available driver. That evening, Hamilton was contacted by a dispatcher and was given a dispatch which he accepted. Approximately eighteen minutes after the telephone contact, Hamilton telephoned the dispatcher and requested that he again be taken off the board, stating that he was "fatigued." On March 14, 1975, Consolidated sent Hamilton a "warning letter." That warning letter was issued "for not being available for work."
 
 
 [4]
 Hamilton had argued that the March 14th letter was in violation of the Union contract because it, in effect, penalized him for refusing a dispatch on the basis of fatigue even though company rules provide that no driver is required to drive when he is fatigued. At the hearing, Dobyns responded that Hamilton voluntarily went on the board at 11:36 a. m. and accepted a dispatch at 10:00 p. m. and then eighteen minutes later, suddenly became fatigued. Dobyns argued that he could not have been fatigued from working since he had been off that day